**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | **Case No. 1:21-cr-283-1 (APM)** |
| MARK REBEGILA, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.   INTRODUCTION**

It is with a somber heart that Mark Rebegila appears before this Court for sentencing following his acceptance of responsibility upon entering a plea of guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Mr. Rebegila's actions on January 6, 2021, weigh heavily on his mind, and his regret and remorse are sincere. Mr. Rebegila is a humble, hardworking, law-abiding family man who has never before been involved in the criminal justice system.

Based upon Mr. Rebegila's personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, and the almost nonexistent likelihood of recidivism, Mr. Rebegila respectfully requests that the Court impose a probationary sentence in this matter, as it would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a).

*Mark Rebegila's Background*

Mark Rebegila is a thirty-two (32) year old husband and father of two daughters and two sons. *See* PSR at ¶ 40. Mr. Rebegila and his wife are expecting their fifth child later this year. *Id*.

1

He is a first-generation American whose parents immigrated to the United States in the mid-1980s, just a few years before he was born. *Id.* at ¶ 34. When he was just one-year old, he moved to Romania where his grandparents cared for him while his parents returned to the United States to earn money for the family. *Id.* at ¶ 38. When he was about eight years-old, Mr. Rebegila returned to the United States, where he grew up with his siblings in St. Marys, Kansas. *Id.*

While Mr. Rebegila's mother worked hard to support the family, he faced his share of adversity as a child. Shortly after Mr. Rebegila returned to the United States, his parents separated, and his father essentially drifted out of the family's life. *Id.* at ¶ 36. Mr. Rebegila had no meaningful relationship with his father, who only began reconciling with his children during the final months of his life in 2018. *Id.* at ¶¶ 36-37. In 1998, soon after his parent's separation, Mr. Rebegila's younger sister was killed in a car accident at age six. *Id.* ¶ 36. Nevertheless, Mr. Rebegila overcame these traumatic experiences, as well as the challenges of learning English and adjusting to a new culture, and eventually graduated from high school in 2009. *Id.* at 48.

Since high school, Mr. Rebegila has worked at the Onyx Collection, a bathroom fixture manufacturer, in his hometown of St. Marys, Kansas. *Id.* at ¶ 51. Mr. Rebegila has built an impressive career in his fifteen (15) years at the company. As reflected in several of the letters referenced below and attached to this memorandum, Mr. Rebegila has also developed strong personal and professional bonds with his colleagues.

Mark Rebegila is a man who strives to live his life by the values of honesty, authenticity, humility, accountability, and forgiveness. Raised by a single mother, he knows the value of hard work and the importance of family. He is a devout Catholic who is active in his church, coaches his five-year-old son's soccer team, and a friend who is always willing to lend a hand to those in need. *See* Exhibits A-F.

**II.     18 U.S.C. § 3553(A) FACTORS**

    **A.  The Nature and Circumstances of the Offense.**

Mr. Rebegila's involvement in the instant offense is extraordinarily regrettable. As he writes in his letter to the Court, he "would like to apologize to all… who have been hurt by [his] actions." *See* Exhibit A. Mr. Rebegila was at the Capitol by himself on January 6, 2021. He was with the crowd and, approached the Capitol building long after other individuals had begun entering. Mr. Rebegila walked into the Capitol building and remained inside for about six minutes. *See* PSR at ¶ 19. Thirty minutes later, he entered the building through a different door, and exited about three minutes after that. Mr. Rebegila was neither violent nor aggressive. He takes responsibility for entering the Capitol when he knew he did not have permission, and he has been fully cooperative and compliant with law enforcement and Court officials in the fourteen (14) months since his arrest on March 15, 2021. After his arrest, Mr. Rebegila was released from custody.

    **B.  Mr. Rebegila's History and Characteristics.**

Mr. Rebegila's arrest stands in stark contrast to the principles of loyalty and integrity that have guided him throughout his life. He has never before been in conflict with the law, and he has been a model citizen while under pre-trial supervision. He is thirty-two years old, has been married for twelve years, has been working at the same company for over half his life, and is excited to welcome his fifth child in September. As the son of immigrants who fled the repression of the Soviet Union in the 1980s, Mr. Rebegila in many ways represents the American Dream.

At an early age, he learned first-hand the value of hard work, and he has applied those lessons to his own life. Mr. Rebegila pours himself into his job and his family to ensure his children have opportunities that were not available to him when he was growing up. He is a devoted soccer fan and has coached youth teams in his community for the past ten-years. *See* Exhibit A.

Mr. Rebegila is well-aware that his interest in U.S. politics his shaped by his family's history. He is proud that he was the first person from his family's village in Romania to be born in the United States. *Id*. He knows how lucky he is to be a United States citizen and takes "full responsibility" and apologizes for any way in which his conduct on January 6th may have contributed to a "further divide of this great country." *Id*.

Mark Rebegila is beloved and respected by those who know him personally and professionally. *See* Exhibits B-F. The letters submitted on his behalf paint the portrait of a man who is genuine, loved, and admired for his work ethic, faith, and devotion to his family and community. *Id*.

Louis Anastasis has known Mr. Rebegila his entire life and can attest to Mr. Rebegila's kind and caring nature. *See* Exhibit B. Just a few years older than Mr. Rebegila, Mr. Anastasis's father became Mr. Rebegila's godfather shortly after Mr. Rebegila was born. They became particularly close as children when Mr. Anastasis's family took Mr. Rebegila and his mother in after she left his father. *Id*. Mr. Anastasis has now worked at the Onyx Collective for over a decade and the two childhood friends are also long-time coworkers. *Id*.

Mr. Anastasis's father recently passed away in January 2022. *Id*. Mr. Rebegila immediately visited the family and spent hours with Mr. Anastasis and his mother, providing

support and comfort after their loss. Mr. Rebegila sacrificed "hundreds of dollars" in bonus pay to take the day off from work to attend the funeral, where he served as a pallbearer. *Id*.

Mr. Anastasis has also had a front-row seat to Mr. Rebegila's work ethic at the Onyx Collective. After starting as a part-time worker while still in high-school, Mr. Rebegila made impressive strides as soon as he graduated high school and began working full-time. He became a manager "before he was old enough to buy a beer" and quickly rose through the ranks thereafter. *Id*. Today, he is a manager in custom bases, considered "the most elite department at Onyx. *Id*. Mr. Anastasis knows that Mr. Rebegila's arrest is extremely "out of character." *Id*. He has seen Mr. Rebegila work hard over the past year to move forward and knows he will never again put himself or his family in this position.

John Archer is another life-long family friend who is also a long-time colleague at Onyx. *See* Exhibit C. Mr. Archer lived across from the Rebegilas when Mark was a boy and observed how hard the family, led by his mother, worked to support each other. *Id*. Mr. Archer has been a manager at Onyx for over thirty (30) years, and he reconnected with Mr. Rebegila when the latter began working at Onyx in high school. Mr. Archer was impressed by how quickly Mr. Rebegila "distinguished himself as a very hard working and dependable worker." *Id*. Mr. Archer was impressed by Mr. Rebegila's performance, consistently meeting high production goals, as well as his personal management style, often overseeing people more than twenty years older than him. *Id*. Mr. Archer knows Mr. Rebegila to be a man of "strong religious faith" who is "consistently upbeat" with a "trademark" "sense of humor and friendliness." *Id*. Mr. Rebegila is "an exemplary father, employee, and man of faith," and Mr. Archer has every confidence that Mr. Rebegila "will not disappoint[]" this Court with his future endeavors. *Id*.

Mr. Rebegila has also impressed the president of The Onyx Collection, Robert Awerkamp, who confirms Mr. Rebegila's "energy and ability to learn new things." Exhibit D. Mr. Awerkamp recognizes how well-respected Mr. Rebegila is amongst his family and friends and how out-of-character his actions were on January 6. *See id.* Mr. Awerkamp is confident that Mr. Rebegila will be a "model citizen" moving forward and can continue his career at Onyx. *See id*.

Charles Baylor has known Mr. Rebegila since he was a boy when Mr. Baylor worked with Mr. Rebegila's mother. *See* Exhibit E. Mr. Baylor has stayed friends with the Rebegila family and regularly visits Mr. Rebegila and his family every few weeks. *See id.* He admires Mr. Rebegila's "fine family" who "all adore him." *Id*. Mr. Rebegila has "learned quite a bit from this experience," write Mr. Baylor. *Id*. In fact, Mr. Baylor observed a shift in Mr. Rebegila's perspective who has "stepped back from the whole political thing" over the past fifteen (15) months. *Id*. As with all who know Mr. Rebegila, Mr. Baylor reflected on the striking dissonance between the way Mr. Rebegila conducts himself on a daily basis with his friends and family and his conduct on January 6. *See id*.

Another good friend of Mr. Rebegila, Chris Greene, remarks upon his friend's "great fortitude and genuine care of other people." Exhibit F. Mr. Greene, who owns his own small business, describes Mr. Rebegila's as "an inspiration to his coworkers" who "shows up every day" with a "great attitude." *Id*. Mr. Rebegila is "very stable, reliable, and a productive citizen." *Id*. He is a "good, productive man, with a good character" who has "punished himself immensely" for his actions on January 6. *Id*.

It is clear that Mr. Rebegila is a man of great values who recognizes that he made the worst decision of his life by entering the Capitol on January 6, 2021. Those who know him are

unanimous in the high esteem in which they hold Mr. Rebegila and their confidence in his character.

### C. Mr. Rebegila Poses Little or No Risk of Recidivism.

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Rebegila does not fit the archetype of a person who will commit new criminal offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Rebegila's character, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases and are particularly low for first-time offenders. *See Measuring Recidivism* at 12. More specifically, with respect to Mr. Rebegila, who is 32 years old, defendants aged 31-35 with no criminal history have a recidivism rate of less than 15 %. *Id.* at 28. There is, quite simply,

nothing in the record to indicate that Mr. Rebegila would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Rebegila are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted. *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*).

Beyond the statistics, Mr. Rebegila personally presents no risk of recidivism. As detailed by his family and friends, Mr. Rebegila has lived his entire life guided by principles completely incongruous with his actions on January 6, 2021. As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Rebegila himself. He prides himself on living a life of integrity and on the example he sets for his children. He has taken ownership of his actions and acknowledged his wrongdoing because he sincerely regrets what he has done.

Moreover, regardless of the sentence imposed by this Court, Mr. Rebegila has already faced substantial consequences as a result of his actions and arrest. His arrest and case are public knowledge, which is particularly notable in St. Marys, Kansas, the close-knit town of less than 3,000 people where Mr. Rebegila grew up and now lives with his family. Mr. Rebegila's actions on January 6 will remain a dramatic aberration in an otherwise exemplary life of service to his family and community. As such, the requested sentence of probation is appropriate to serve as an adequate deterrent to Mr. Rebegila and protection for the public.

### D. The Need to Avoid Unwarranted Sentence Disparities In Similarly Situated Defendants.

The Court must consider the need to avoid unwarranted sentence disparities among defendants with similar criminal histories convicted of similar criminal conduct. *See* 18 U.S.C § 3553(a)(6); *see also United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008). It is especially important to consider this factor in the context of January 6 Capitol breach cases because of the vast array of conduct and character differences. Unlike many other January 6 defendants, Mr. Rebegila made no incendiary comments online or social media posts in the days before January 6. Nor did he proudly promote his participation in the riot afterwards as did so many other defendants. Mr. Rebegila is not active on social media and has even taken a step back and lost interest in politics since January 6.

Unlike many other January 6 defendants, Mr. Rebegila was not violent or aggressive in word or deed. He did not force his way into the Capitol building or climb through a broken window. He did not barge past officers or travel through clouds of tear gas. Instead, along with hundreds of others, he walked through an open door. He remained inside of the Capitol building for a total of no more than ten (10) minutes.

These distinctions are important not to minimize Mr. Rebegila's culpability, but to contrast his actions with more egregious behavior of many other defendants and properly place his conduct on the spectrum of January 6 defendants.

As an example, in *United States v. Bennett*, the Government sought a three-month period of home confinement after a guilty plea to parading. *See* 1:21-cr-227-JEB. Mr. Bennett was an admirer of the Proud Boys, was very active on social media planning and promoting the events of January 6, 2021, and livestreamed while inside the Capitol for nearly 30 minutes, documenting much of the riotous behavior. *Id*. at ECF No. 24. The Government made clear that there was no evidence that Mr. Bennett committed any violence or destruction while inside.

Ultimately, Judge Boasberg sentenced Mr. Bennett to twenty-four (24) months of probation, along with the $500 restitution and $10 special assessment.

Another example that provides guidance to the Court is *United States v. Bustle*, who pled guilty to parading, and was sentenced to twenty-four (24) months of probation after being inside the Capitol for 30 minutes and posting "we need a revolution" on social media. She was also not accused of any violence or destruction. *See* 1:21-cr-238 at ECF No. 39.

In *United States v. Rosa*, the Government sought a sentence of one (1) month of home confinement after a plea to parading. *See* 1:21-cr-68-TNM, ECF No. 66. Mr. Rosa posted on social media about the day's events and acknowledged hearing bangs and smelling pepper spray in the air – an admission that the situation was escalating. He remained inside the Capitol for approximately 20 minutes, but there was no evidence he participated in any violence or destruction. *Id*. Ultimately, Judge McFadden sentenced Mr. Rosa to twelve (12) months of probation, along with the $500 restitution and $10 special assessment. *Id*. at 79. In *United States v. Doyle*, Judge McFadden sentenced the defendant to two (2) months of probation and a $3,000 fine, $500 in restitution, and a $10 special assessment after she entered the Capitol through a broken window, remained inside for 24 minutes, and appeared to be chanting and yelling in the direction of law enforcement. 1:21-cr-324-TNM at ECF No. 27, 34.

There have been individuals who have received sentences including incarceration, but their conduct is easily distinguishable and much more serious than Mr. Rebegila. In *United States v. Rau*, the defendant entered a guilty plea to one (1) count of Disorderly Conduct in a Capitol Building. He received a 45-day jail sentence, $500 in restitution, and a $10 special assessment, primarily because he came to Washington, D.C. prepared for violence by bringing Kevlar-lined gloves and a medical kit, entered the Speaker's conference room inside the Capitol,

encouraged and incited violence against police, and deleted evidence from his cell phone after the fact. 1:21-cr-467 at ECF No. 13.

Mr. Rau's codefendant, Derek Jancart, was given the same sentence following a guilty plea to the same charge for many of the same reasons – coming to Washington, D.C. prepared for violence by bringing a gas mask and two-way radios, encouraging and inciting violence during the riot, and his substantial social media activity spreading propaganda and downplaying the seriousness of January 6, 2021. *See United States v. Jancart*, 1:21-cr-148, ECF No. 25.

Mr. Rebegila's character and conduct are easily distinguishable. Mr. Rebegila walked into the Capitol through an open door, not a broken window like in *Doyle*. He was inside for about six minutes, before he exited the same way he came in. About thirty (30) minutes later, he entered through a different open door, and stayed inside for about three minutes before leaving. He had a brief, peaceful interaction with a law enforcement officer, and otherwise kept to himself. He made no attempt to incite the crowd or taunt law enforcement officers. His conduct surely falls at the "low end" of the spectrum of behavior for the thousands of individuals who were at the Capitol on January 6, and a probationary sentence appropriately reflects Mr. Rebegila's inherent conduct as well as his actions in relation to the thousands of others at the Capitol.

> **E.  Mr. Rebegila's Public Arrest and Involvement in the Case Serve as Adequate Deterrence to Others.**

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." There is no need for personal deterrence in this case, as Mr. Rebegila is not the type of person who would commit any further crimes in the future. Mr. Rebegila has absolutely no criminal history, and this experience has been a defining moment in his life. Arguably, the government already substantially achieved the maximal

deterrent effect of Mr. Rebegila's offense simply by charging and convicting him. As a result, numerous media outlets will discuss Mr. Rebegila and the substance of his offense, as they have done throughout the pendency of this matter. Further, Mr. Rebegila will be discussed in various conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality from which he simply cannot escape. In short, the impact to Mr. Rebegila's reputation sends a strong message to anyone who might attempt such conduct in the future.

Respectfully submitted,

_____/s/_____
David Benowitz
Bar # 451557
*Counsel for Mark Rebegila*
Price Benowitz LLP
409 7th Street, NW,
Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
F: (202) 664-1331
David@PriceBenowitz.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of April 2022, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via ECF to Assistant United States Attorney Sean P. Murphy, United States Attorney's Office, Torre Chardon, Suite 1201, 350 Carlos Chardon Avenue, San Juan, PR 00918.

_____/s/_____
David Benowitz