**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-283 (APM)** |
| **v.** | : | |
| | : | |
| **MARK ROGER REBEGILA,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mark Roger Rebegila to a split sentence of sixty days incarceration followed by three years' probation, and $500 restitution.

## I.      <u>INTRODUCTION</u>

Rebegila is a 32-year-old manager at The Onyx Collection, a manufacturer of bathroom fixtures in Belvue, Kansas. On January 6, 2021, Rebegila was a rioter and active participant in the siege of the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Rebegila pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a split sentence of sixty days incarceration split with three years' probation is appropriate in this case because he: (1) entered the Capitol twice, despite being forced out the first time by law enforcement; (2) entered into at least two private office spaces—specifically the Senate Parliamentarian's Office (S132) and

the office directly across therefrom (S131)—during his first breach of the Capitol; (3) remained on restricted grounds until at least 4:37 PM when a flash bang device can be seen going off in the vicinity of the Capitol's North Door; (4) initially bragged about his illegal breach of the Capitol to friends, claiming that he sat in a lawmaker's chair and stole a bottle of liquor[1]; and (4) admitted that he later deleted evidence of his criminal conduct "because he did not want to get in trouble."

At this time, the government has uncovered no evidence that Rebegila personally engaged in violence or property destruction during the siege. The government does not view Rebegila's restraint in this regard as a mitigating factor since if Rebegila had engaged in those activities, the government likely would have presented felony charges to the Grand Jury. A defendant's engagement in or abstention from violence/destruction is only of limited utility in the misdemeanor sentencing analysis.

The Court should also consider that Rebegila's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Rebegila participated in a riot that succeeded in halting the Congressional certification. That, his multiple entries into the Capitol, and his forays into offices in that building renders a split sentence of sixty days incarceration followed by a three-year term of probation both necessary and appropriate in this case.

---

[1] The defendant has since denied that he did any of those things and, at this time, the government does not possess evidence that shows the defendant sitting in a lawmaker's chair or stealing a bottle of liquor.

## II.     <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol that the parties agreed to as part of the Statement of Offense. ECF No. 33, ¶¶ 1-7. In doing so, however, the government in no way intends to deemphasize that each participant in a riot is part of that riot. As Judge Chutkan recognized, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioter contributed directly and indirectly to the violence and destruction of that day, including Rebegila.

*Rebegila's Role in the January 6, 2021, Attack on the Capitol*

Rebegila and other individuals from St. Marys, Kansas, travelled together to Washington, D.C. Rebegila admits that he did so to protest Congress' certification of the Electoral College. While speaking with the FBI prior to his arrest, Rebegila provided a picture from earlier in the day of him with an unidentified individual standing in front of the Washington Monument.



***IMAGE 1***—*A photograph provided to the FBI by Rebegila showing him standing in front of the Washington Monument with an unidentified individual. The unidentified individual is holding a Gadsden flag zip-tied to a white PVC pipe, and it appears to be the same flag that Rebegila carries when he breached the Capitol.*

On January 6, 2021, at approximately 2:42 p.m., a group of rioters breached a fire door next to the Senate Parliamentarian's Office—referred to as the Parliamentarian's Door. The rioter who caused that breach did so by using a metal walking cane to break out one of the windows. As described in greater detail below, Rebegila participated in that breach by entering through the Parliamentarian's door at approximately 2:54 p.m. Various surveillance and open-source intelligence (OSINT) images and videos from around the time and at that location show that the way the rioters gained entry was through chaotic and violent throngs.



**IMAGE 2**—*An open-source intelligence (OSINT) map created by private citizens—known by their handles @ne0ndistraction and @sansastark525—and available at https://jan6attack.com/maps.htm. All time shown on USCP CCV screenshots are in Coordinated Universal Time (UTC), where, for example, 19:42 is equal to 2:42 p.m.*





*IMAGE 3* and *IMAGE 4* (top to bottom)—Screenshots from USCP CCV showing the West Lawn and West Plaza as they appeared on January 6, 2021, at 2:42 p.m., the approximate time that a group of rioters were breaching the Parliamentarian's Door.





*IMAGE 5* and *IMAGE 6*—*Screenshots from USCP CCV showing the (top) Northwest Lawn, Pennsylvania Lawn, Northwest Terrace, and the north side of the West Plaza; and (bottom) the Northwest Terrace and Northwest Plaza as they appeared on January 6, 2021, at 2:42 p.m., the approximate time that a group of rioters were breaching the Parliamentarian's Door. The Parliamentarian's Door is indicated with a red arrow. The Senate Wing Door—the first brech point of the Capitol—and the two windows flanking it can be seen in the background just above the heads of the rioters.*





**IMAGE 7** and **IMAGE 8**—*Screenshots from USCP CCV showing Rebegila entering the Capitol through the Parliamentarian's Door at approximately 2:54 p.m., stopping to take a selfie-style photograph as he enters.*

As mentioned in the Statement of Offense of this case, when interviewed by the FBI, Rebegila stated that when he asked an officer if he could go inside, the officer shrugged his shoulders.[2] Images 7 and 8 show that this is not accurate.

Although Rebegila never left the immediate vicinity of the Parliamentarian's Door, he entered Senate office S131 and remained inside for approximately one minute, and he also entered Senate office S132—the Parliamentarian's Office—for approximately one minute. By that time, as can be seen in another video recovered from a separately charged defendant's[3] cellphone during the course of this investigation, there were sounds and actions by law enforcement at that time and at that location that made it obvious that the rioters were not allowed to be inside. In this video, one can hear the chants of the rioters ("Whose house? Our House!") as well as an unidentified sound. The individual narrating, Entrekin, can be heard saying, "What's that . . . what's that sound? Huh? Taser? That's a Taser? What, a machinegun Taser? Something's going on. They're pushing us back out. Some kind of machinegun Taser or something, I don't know what the hell is going on. I want to go in here, though."[4]

The separately charged defendant Entrekin then entered the Senate Parliamentarian's Office (S132) almost exactly one minute after Rebegila had left, specifically at approximately 2:59 p.m. The following are photos of how the Senate Parliamentarian's Office appeared at that time. To be clear, the government does not possess any evidence that Rebegila caused any of the damage, but instead includes these photos as a representation of the condition of the Parliamentarian's Office that Rebegila would have observed when he was inside.

---

[2] *See* ECF No. 1-1, p. 2;  https://www.newsweek.com/capitol-rioter-says-officer-shrugged-when-he-asked-if-he-could-enter-building-1576524

[3] *U.S. v. Nathan Wayne Entrekin*, 21-CR-686 (FYP).

[4] This video will be provided as an Exhibit to be shown at the Sentencing Hearing.





*IMAGE 9* and *IMAGE 10*—*Screenshots from a separately charged defendant's cellphone showing how the Senate Parliamentarian's Office would have appeared at 2:59 p.m., approximately one minute after Rebegila had been inside.*

At a certain point, Rebegila stopped and bent over to pick up a piece of glass that had been broken out of the door. Rebegila flipped it over and then nudged it with his foot. Even after seeing the destruction of the Parliamentarian's Office and seeing the broken glass, Rebegila continued to press forward into the Capitol. It's not until around 2:59 p.m.—about the same time when the separately charged Entrekin can be heard stating, "They're pushing us back out."—that Rebegila turns around and makes his way back out the same way he came in, leaving at around 3:00 PM.

Although Rebegila can be seen recording videos and taking photos, neither was recovered because, as Rebegila himself admitted, he deleted them because he did not want to get in trouble. Based on Image 10 above—showing a rioter sitting in a lawmaker's chair—and the admissions made in the ongoing trial of separately charged defendant Dustin Thompson[5]—that he stole a bottle of liquor from the Parliamentarian's office—it may have been during this period that Rebegila saw others engaging in the exact behavior he took credit for in messages he sent to others.



*IMAGE 11—A screenshot from USCP CCV showing Rebegila taking a selfie style photograph in front of the broken-open door of the Senate Parliamentarian's Office at approximately 2:55 p.m.*

---

[5] *See U.S. v. Dustin Byron Thompson*, 21-CR-161 (RBW); https://www.washingtonpost.com/dc-md-va/2022/04/14/jan6-trump-presidential-orders-thompson-capitol/





*IMAGE 12* and *IMAGE 13*—*(top to bottom) Screenshots from USCP CCV showing Rebegila picking up a piece of glass that had been broken out of the fire door during the breach at approximately 2:55 p.m., and Rebegila entering Senate Office S131 at approximately 2:56 p.m.*





*IMAGE 14* and *IMAGE 15*—Screenshots from USCP CCV showing Rebegila exiting the Parliamentarian's Office at approximately 2:58 p.m. and leaving the Capitol at approximately 3:00 p.m. after law enforcement blocked Rebegila and other rioters from proceeding further north.

As stated above, Rebegila and the rest of the rioters were forced out of the Parliamentarian's Door at around 3:00 p.m. Instead of leaving restricted grounds, Rebegila stayed in the vicinity of the Northwest Plaza and reentered the Capitol through the Senate Wing Door thirty-seven minutes later at approximately 3:37 p.m.





*IMAGE 16* and *IMAGE 17*—*A screenshot from Metropolitan Police Department bodyworn camera showing Rebegila in the NW Plaza at approximately 3:22 p.m.; and a screenshot from USCP CCV showing Rebegila entering the Senate Wing Door at approximately 3:37 p.m. Despite the heavy police presence denying Rebegila entry, Rebegila took pictures and remained inside for approximately three minutes before leaving.*

After being denied entry into the Capitol via the Senate Wing Door, Rebegila still remained on restricted grounds for approximately one more hour.



*IMAGE 18—A screenshot from USCP CCV showing Rebegila in the vicinity of the North Door of the Capitol at approximately 3:58 p.m.*

During his voluntary interview with the FBI, Rebegila turned over the only video he had not deleted, specifically one that was filmed on the North Side of the Capitol at approximately 4:37 p.m. The time was determined by syncing the flash from a crowd dispersion device. In the video, Rebegila states, "The final stand here! They're about to push us all out. I'm getting pushed. Ope, flash bang!"

 

*IMAGE 19 and IMAGE 20—A side-by-side comparison of the video recorded by Rebegila (left) and USCP CCV from approximately 4:37 p.m.*







*IMAGE 21/21a* and *IMAGE 22/22a*—*A side-by-side comparison of the video recorded by Rebegila (left) and USCP CCV from approximately 4:37 p.m.*

In total, Rebegila spent approximately ten minutes inside the Capitol, but several hours on restricted grounds. Rebegila saw the destruction and mayhem inside the Parliamentarian's Office, was forced out with the rest of the rioters from the Parliamentairan's Office corridor, tried to reenter thirty-seven minutes later but was prevented from doing so by a large police presence, but still stayed on restricted grounds until at least 4:37 PM. Rebegila admitted at his change of plea hearing that he knew both times he entered the Capitol that he did not have permission or authority to do so. Rebegila further admitted that while inside the Capitol, he paraded, demonstrated, or picketed.

*Rebegila's FBI Interview*

On January 15, 2021, prior to his arrest, Rebegila voluntarily agreed to speak with the FBI and fully admitted to his conduct on January 6, 2021. Rebegila also admitted that in the less-than-ten-days since January 6, he deleted nearly all his photos and videos. Rebegila has been forthcoming to the FBI throughout the investigation, charging, and prosecution processes. To the government's knowledge, Rebegila has eschewed social media and has not attempted to publicly defend his actions or the actions of others who were part of the Capitol siege on January 6, 2021. Although Rebegila stayed on restricted grounds for an extended period of time and entered the Capitol twice, there is no evidence that he engaged in violence against police officers or others on January 6, 2021.

### III.    THE CHARGES AND PLEA AGREEMENT

On March 10, 2021, Rebegila was charged via Criminal Complaint with violations of 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On March 15, 2021, he was arrested in St. Marys, Kansas. On April 6, 2021, Rebegila was charged by four-count Information with violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 1, 2021, Rebegila pleaded guilty to Count Four of the Information, charging him with a violation of

40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol building. By plea agreement, Rebegila agreed to pay $500 in restitution to the Department of the Treasury.

## IV.    STATUTORY PENALTIES

Rebegila now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Rebegila faces a term of imprisonment up to six months and a fine of up to $5,000. Rebegila must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this misdemeanor case, 18 U.S.C. § 3553(a) informs the factors the Court must consider in crafting a sentence that is sufficient, but not greater than necessary to achieve the goals under that same section. This section identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a split sentence of sixty days incarceration followed by a three-year term of probation.

## VI.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The siege of the Capitol on January 6, 2021, was an unparalleled criminal offense in American history. It represented a grave threat to our democratic norms. It was the one of the only

times in our history when the building was occupied by rioters who were hostile to American democratic norms and processes.

Each defendant should be sentenced based on their individual conduct. This Court should note, however, that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would have—at a minimum—crossed through numerous barricades and stepped or climbed over numerous barriers. They would have heard the cries and throes of a mob. Depending on the timing and location of their approach, they may have also observed fighting with law enforcement officials and smelled chemical irritants in the air or felt the effects of the same in their eyes. No rioter was a mere tourist that day.

This was certainly true for Rebegila who approached from the west. As shown in Images 3 through 6, thousands of protestors had descended on the Capitol at around the time that Rebegila would have been approaching the Capitol. He would have seen the fallen and trampled barriers around the West Lawn. Rebegila would have seen and heard the chaos on the West Plaza and heard the chants and cries as the rioters broke into the Capitol through the Parliamentarian Door. *See* "West Capitol Plaza & 'Tunnel' - 2:27-3:21 p.m. – Jan 6th" (https://youtu.be/N562Ti_vI9A?t=877). The second breach of the Senate Wing Door—a violent and aggressive concerted effort by the rioters that occurred mere yards away from the Parliamentarian Door—happened at 2:48 p.m., so Rebegila would certainly have heard the shouting and seen the violence happening in the same Plaza where he was.

While looking at each defendant's individual conduct, the government recommends that the Court assess such conduct on a spectrum. This Court, in determining a fair and just sentence should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the

defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Rebegila not only made his way through the madness of the West Lawn to the Northwest Plaza, he also maneuvered his way inside once the Parliamentarian's Door was breached. Once he was in, he went into two separate offices, including the Parliamentarian's Office, witnessed its destruction, and despite that and seeing broken glass on the floor, he attempted to move deeper into the Capitol, not out. As mentioned above, the rioters were expelled from the Parliamentarian's Door, but Rebegila stayed in the NW Plaza and made his way back inside the Capitol at the Senate Wing Door nearly forty minutes later. Even after being expelled a second time, an hour later he was still filming videos while declaring on behalf of the rioters, on behalf of those seeking to occupy the Capitol and disrupt the peaceful transition of power, "The final stand here! They're about to push us all out! I'm getting pushed. Ope, flash bang!" Later, he would brag that he did what he may have seen others doing, specifically sitting in a chair and stealing liquor.

Rebegila quickly accepted responsibility but it is difficult to assess the extent of his remorse.. As several other sentencing proceedings for these defendants have shown, the expression of remorse can be an unreliable watermark in January 6 cases. For example, District Court Judge Tanya S. Chutkan spoke about remorse as follows:

> And I take into account the government's statement and [defense counsel]'s statement that he accepted early responsibility. But [the defendant's] remorse—and I believe his remorse is sincere—[the defendant's] remorse didn't come when he left that Capitol. It didn't come

> when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Carl Mazzocco*, 21-CR-54 (TSC), ECF No. 32, pp. 29-30. Judge Lamberth was more skeptical in a Memorandum Opinion authorizing the imposition of a split sentence as to Class B misdemeanor convictions.

> The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse. Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, pp. 3-4.

Accordingly, the nature and the circumstances of this offense render the government's proposed sentence sufficient but not greater than necessary to reflect the seriousness of the instant offense, to promote deterrence, to protect the public from future crimes that may be committed by the defendant, and to avoid unwarranted disparity.

## VII.    REBEGILA'S HISTORY AND CHARACTERISTICS

As set forth in the PSR, Rebegila's life appears to be completely devoid of any contact with the criminal justice system. As of the writing of this memorandum, Rebegila has been compliant with his conditions of pre-trial release. Additionally, the government recognizes and finds laudable the fact that, while born in the United States, the defendant spent much of the first eight years of his life in Romania. As soon as he returned, his parents divorced and defendant's father was a minimal part of his life from thereon out. When Rebegila was only nine, a tragedy occurred resulting in the death of Rebegila's younger sister. Notwithstanding the significant upheaval and challenges of his early life, Rebegila—January 6 notwithstanding—has done a laudable job of

creating what appears to be a stable home environment with his wife and children and has maintained stable employment with the same company for over sixteen years.

Be that as it may, and for reasons listed below, Rebegila's actions and behavior on January 6, 2021, distinguish him from many of the defendants who have received probationary sentences or sentences of home detention as a condition of probation. With these considerations in mind, it appears that specific deterrence in the form a split sentence consisting of sixty days incarceration followed by a three-year term of probation is sufficient but not greater than necessary to specifically deter Rebegila—and others generally—from engaging in similar violations of law in the future.

## VIII.   THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROMOTE RESPECT FOR THE LAW

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a split sentence of sixty days incarceration followed by a three-year term of probation. The government agrees with many Judges in this District who have stated that no sentence for a January 6 defendant should be probation only. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov /files/Wray%20Testimony.pdf

IX.    **THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to and did in fact interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While entering restricted grounds and moving forward, Rebegila did not turn back when he saw the downed fence and barricades. He went forward. He did not turn back when making his way through the increasingly frenzied crowd on the west front or when he saw and heard the violence taking place in the location on the Lower West Terrace known as The Tunnel. Rebegila went forward. He joined rioters in the Brumidi Corridors as others ransacked the Parliamentarians Office. He did not recoil when he saw the destruction and mayhem. He took selfies and attempted to move deeper into the Capitol. He joined the group of rioters that unsuccessfully confronted law enforcement in the hallway just outside the Parliamentarian's office. When forced out of that hallway, he stayed in the NW Plaza. Thirty-seven minutes later, he tried to reenter. Thwarted at the doors there, he made his way to another hotbed of contention—the North Door—where violence continued long after the main breach points (Senate Wing Door and East Rotunda Door) were secured.[7]

As Judge Chutkan stated:

> What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from

---

[7] See the following links for additional OSINT video showing the siege on the North Door:
https://twitter.com/ParlerVideos/status/1354848858732449800 (approximately 3:12 p.m.);
https://twitter.com/ParlerVideos/status/1362305056708689920 (approximately 3:52 p.m.); and
https://twitter.com/ParlerVideos/status/1360850258197172225 (approx 4:31 p.m.).

> one administration to the next, something that has happened with regularity over the history
> of this country. That mob was trying to overthrow the government.

*U.S. v. Mazzocco*, ECF No. 32, p. 24. Rebegila came to Washington, D.C., from Kansas with a group of friends and colleagues. By his own account, Rebegila was the only one to approach the Capitol and breach it once, let alone multiple times. The rest of his travel companions had the sense to know that attacking the Capitol was a step too far. Rebegila, instead, went forward.

Between the Parliamentarian's Door, the Senate Wing Door, the NW Plaza, and the North Door, he was at multiple point of tension and violence between police officers and rioters. Even when he saw the destruction and mayhem being caused by the rioters, he stuck around. And he sought out more. Although he was at times a passive and active participant in that mob, specific deterrence is necessary.

Even considering the defendant's post-crime agreement to speak with the FBI and his compliance with all the requests of law enforcement, Rebegila knew that what he did was wrong. That fact that he deleted the inculpatory videos and photos so quickly is proof of that. But he did it anyway. The government believes that its recommended sentence will achieve the Court's and our federal government's established sentencing goals.

## X.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on law enforcement, to conspiracy to corruptly interfere with Congress.[8] Each offender must be sentenced based on their individual circumstances, but with the backdrop

---

[8] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not become the default.[9] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ( "I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with fewer days incarceration or home detention.

---

[9]   Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Rebegila has pleaded guilty to Count Four of the Information, charging him with willfully and knowingly parading, demonstrating, or picketing in any of the Capitol Buildings, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of his participation in the breach—help to, but do not entirely explain the differing recommendations and sentences. At the end of the day, some of it falls squarely on judicial discretion. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with

significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or an office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office—like the Parliamentarian's Office—poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. The Parliamentarian's Office was clearly recognizable as a private office, and thus implicates similar concerns. And while

there is no evidence that Rebegila actually sat in a lawmaker's chair, that was a claim that he made to another individual, and he certainly saw the destruction of the Parliamentarian's Office and was unmoved enough to stay the course of the riot.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to forty-five days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright*, No. 21-cr-72 (CRC) (thirty days incarceration, one year supervised release).

Like Jancart and Rau, Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Ericson took a beer from a mini fridge. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.  Like Rebegila, Ericson was aware of the crowd outside. *See id.* at 3, 7-8, 13. The government recommended sixty days' jail time, and Judge McFadden imposed a sentence of twenty days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## XI.   THE COURT'S LAWFUL AUTHORITY TO IMPOSE A SPLIT SENTENCE

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### i.     Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989)

(noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[10] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[11]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

---

[10] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[11] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

      ii.    **Analysis**

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of

supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at

808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article

before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Rebegila pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### i.   Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[12]

### ii. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of

---

[12] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[13]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improved or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in Rebegila's case given the requested sentence of sixty days.

## XII.   CONCLUSION

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Rebegila to a split sentence of sixty days' incarceration followed by a three-year term of probation and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

---

[13] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Respectfully submitted,

MATTHEW M. GRAVES
D.C. BAR NO. 481052
ACTING UNITED STATES ATTORNEY


By: _____
    Sean P. Murphy
    D.C. Bar No. 1187821
    Assistant United States Attorney
    U.S. Attorney's Office—District of Puerto Rico
    Torre Chardon, Ste 1201
    350 Carlos Chardon Avenue
    San Juan, PR 00918
    787-766-5656
    sean.murphy@usdoj.gov